Filed 8/27/15  Harrell v. Harrell CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| KATHLEEN L. HARRELL et al.,<br><br>    Plaintiffs and Respondents,<br><br>        v.<br><br>DAVID HARRELL,<br><br>    Defendant and Appellant. | F070603<br><br>(Super. Ct. No. VPR 046700)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Tulare County.  Paul A. Vortmann and Bret D. Hillman, Judges.

David Harrell, in pro. per. for Defendant and Appellant.

Law Offices of James P. Hurlbutt and James P. Hurlbutt for Plaintiffs and Respondents.

-ooOoo-

This is an appeal from an order granting a petition for instructions concerning the terms of a family trust.  The trustees petitioned for instructions determining the validity of an amendment to the trust instrument and other matters.  One of the remainder beneficiaries opposed the petition, primarily contending the amendment was not validly executed and was therefore void.  We conclude the amendment was validly executed by one trustor and ratified by the other, and the trial court correctly determined the other issues presented by the petition.  Accordingly, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In 1983, Robert and Kathleen Harrell created the "Robert E. Harrell Family Trust" (Family Trust), which named as remainder beneficiaries Robert's four children, William Andrew Harrell, David Harrell, Christina Albrow, and Paul Harrell, and Kathleen's two children, Richard Carlstrom and Craig Carlstrom. In 1987, Robert[1] executed a durable power of attorney, naming Kathleen as his attorney-in-fact and authorizing her to take certain actions, including to "create, amend, supplement or terminate any trust" of which he was a trustor.

On March 11, 1998, Robert and Kathleen executed certain documents prepared for them by their attorney, Gareth Houk (now deceased). At that time, Robert signed a second codicil to his will, in which he changed the definition of the terms "child," "children," and "issue" to exclude Paul and to include Maximo Contin, a long-term family friend. The second codicil stated, "I specifically do not provide in this Will for Paul Lee Harrell or his issue," and "[f]or purposes of this Will Paul … shall be deemed to have predeceased me and left no issue surviving him." (Some capitalization omitted.) Robert's signature on the second codicil was witnessed by attorney Houk and Kay Hoskins, his legal assistant.

At the same time, Kathleen signed a first amendment to the Family Trust instrument, which changed the definition of "child," "children," and "issue" to exclude Paul and include Contin. It stated: "It is the specific intent of the trustors not to provide for Paul … or his issue under this instrument," and "[f]or purposes of this instrument Paul … shall be deemed to have predeceased the trustors leaving no issue surviving him." The first trust amendment also contained provisions for the executor of the deceased spouse's[2]

---

[1]    We refer to the family members by their first names for convenience, clarity, and consistency because many of them share a last name. No disrespect is intended.

[2]    As defined in the declaration of trust, "deceased spouse" refers to the first trustor to die, and "surviving spouse" refers to the trustor still living.

estate to make certain elections, including electing to treat certain trust property as qualified terminable interest property (QTIP) for purposes of qualifying for the marital deduction to reduce the federal estate tax due on the deceased spouse's estate. Kathleen signed the first trust amendment on her own behalf and also as attorney-in-fact for Robert. Hoskins notarized the signatures. Robert did not personally sign the first trust amendment. By declaration, Hoskins stated she did not remember why Robert did not sign the first trust amendment for himself. Kathleen did not address that issue in her declaration; at oral argument, her attorney represented she also did not remember why Robert did not sign the first trust amendment himself.

On April 8, 1998, Robert and Kathleen jointly executed a new Schedule A to the Family Trust, updating the list of property included in the trust. It identified Robert and Kathleen as trustors of the Family Trust, "as amended by First Amendment thereto dated March 11, 1998."

Robert died on July 30, 1998. Pursuant to provisions of the Family Trust, on the death of the first trustor, the trust was divided into three trusts: the survivor's trust, the disclaimer trust, and the credit trust.

In February 2014, Kathleen and Craig (plaintiffs), as two of the three successor cotrustees of the survivor's trust, and Kathleen as sole trustee of the credit and disclaimer trusts, petitioned the court for instructions. They sought an order determining: (1) that the terms and conditions of the Family Trust, as of the date of Robert's death, were those contained in the original declaration of trust, as amended by the first trust amendment, executed March 11, 1998; (2) that, as of the date of Robert's death, the remainder beneficiaries in the event of Kathleen's death were William, David, Christina, Richard, Craig, and Contin; (3) that, as of the date of Robert's death, Paul was not a remainder beneficiary; (4) that the survivor's trust is revocable and subject to amendment by Kathleen; and (5) that the credit trust is now irrevocable, but the distribution of assets on the death of Kathleen is subject to a special power of appointment held by Kathleen,

3.

allowing her to direct the distribution of the assets among William, David, Christina, Richard, Craig, and Contin. David filed opposition to the petition.

The matter was heard before Judge Paul A. Vortmann and taken under submission. On August 1, 2014, Judge Vortmann signed and filed his ruling on the submitted matter, in which he determined plaintiffs prevailed on all issues raised in the petition. On August 21, 2014, an order granting petition for instructions was entered by Judge Bret D. Hillman.

David objected to the August 21, 2014, order, on the ground it was based on Judge Vortmann's August 1, 2014, ruling, which David contended was issued without authority because Judge Vortmann had retired on July 31, 2014. No ruling on this objection was made. David appeals from the August 1, 2014, ruling and the August 21, 2014, order.

### *DISCUSSION*

### I. Void Order

In his opening brief, David contended Judge Vortmann's August 1, 2014, ruling was void because he retired the day before he signed and filed it. Further, David asserted Judge Hillman did not have authority to enter an order on the matter because he was not the judge who heard it. In his reply brief, however, David agrees with plaintiffs that the de facto judge doctrine applies to validate Judge Vortmann's ruling; further, either because Judge Vortmann issued a valid ruling as a de facto judge or because there were no disputed, material facts so a determination of the facts was unnecessary, Judge Hillman's order based on Judge Vortmann's ruling was also valid. Accordingly, he requests that we determine the issues raised in his appeal de novo.

"[W]hen a case requiring findings is tried, the trial is not complete but is still in process of determination until findings are signed and filed. Until that time, the trier of the fact may change his mind, and, even though an order has been made directing the entry of judgment, may order a different judgment to be entered." (*Reimer v. Firpo* (1949) 94 Cal.App.2d 798, 800.) When a judge's term of office ends, his judicial power

4.

ceases, and he may not complete a trial that remains unfinished. (*Id*. at p. 801.) The judge's successor or another associate on the bench cannot complete the trial, because the parties are entitled to a decision on the facts of the case from the judge who heard the evidence when the matter is tried without a jury. (*Ibid*.)

The de facto judge doctrine provides: "One who claims to be a public officer while in possession of an office, ostensibly exercising its functions lawfully and with the acquiescence of the public, is a de facto officer. His lawful acts, so far as the rights of third persons are concerned, are, if done within the scope and by the apparent authority of office, as valid and binding as if he were the officer legally elected and qualified for the office and in full possession of it.… In respect of judges, the de facto doctrine operates for the soundness of judgments, orders and decrees." (*Ensher, Alexander & Barsoom, Inc. v. Ensher* (1965) 238 Cal.App.2d 250, 255.) In *Ensher*, Judge Christian had been appointed to a new office, but nonetheless completed the trial in the *Ensher* case. The court concluded the judgment he entered was valid because he was at least a de facto judge at the time it was entered. Judge Christian had not yet taken the oath of office for his new position; he held his place as judge under color of title and with public acquiescence. (*Id*. at p. 256.) No successor had taken his place as judge. He was qualified to act as judge, and the clerk entered the judgment, "which he would not have done for a mere usurper." (*Ibid*.)

Judge Vortmann signed and filed his ruling the day after he retired. There is no evidence a successor had assumed his position. As in *Ensher*, he was personally qualified to act as judge and the clerk entered the ruling, rather than refusing to do so because he was a mere usurper. Thus, on the day the ruling was entered, he held his place as judge under color of title and with public acquiescence. Accordingly, he entered a valid ruling as a de facto judge.

When the trial court has conducted a trial of a question of fact, it must issue a statement of decision explaining the factual and legal basis for its decision if a party

5.

requests such a statement. (Code Civ. Proc., § 632.) "In all cases where the decision of the court has been entered in its minutes, and when the judge who heard or tried the case is unavailable, the formal judgment or order conforming to the minutes may be signed by the presiding judge of the court or by a judge designated by the presiding judge." (Code Civ. Proc., § 635.) This section has been interpreted to authorize the presiding judge or his designate to sign the formal judgment "only where (1) no statement of decision has been requested or (2) the judge who has heard the evidence has already provided the parties with a statement of decision upon their request for it." (*Armstrong v. Picquelle* (1984) 157 Cal.App.3d 122, 127, italics omitted.)

Because this matter was heard within one day, the request for a statement of decision was required to be made prior to the submission of the matter for decision. (Code Civ. Proc., § 632.) No such request was made. Consequently, Code of Civil Procedure section 635 authorized the presiding judge or his designate to enter judgment based on Judge Vortmann's ruling. We conclude neither Judge Vortmann's ruling nor the judgment entered by Judge Hillman was void.[3]

## II.    Standing to Appeal

Plaintiffs contend David's appeal should be dismissed because he lacks standing to appeal. We disagree.

"Any party aggrieved may appeal" from an appealable adverse judgment or order. (Code Civ. Proc., § 902; *County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 736–737.) "A party who has an interest recognized by law that is adversely affected by the judgment or order is an aggrieved party. [Citations.] The interest must be immediate and substantial, and not nominal or remote." (*Serrano v. Stefan Merli Plastering Co., Inc.* (2008) 162 Cal.App.4th 1014, 1026–1027.) Standing to appeal is a jurisdictional matter.

---

[3]    In the absence of contrary evidence, we presume official duty was regularly performed (Evid. Code, § 664) and Judge Hillman was an appropriate judge to enter judgment based on Judge Vortmann's ruling.

6.

(*United Investors Life Ins. Co. v. Waddell & Reed, Inc.* (2005) 125 Cal.App.4th 1300, 1304 (*United Investors*).)  It "is construed liberally, and doubts are resolved in its favor." (*In re K.C.* (2011) 52 Cal.4th 231, 236.)

David's standing to oppose the petition in the trial court is not in issue in this appeal.  The trial court did not rule that David lacked standing to present his opposition to the petition for instructions.  Thus, David was not aggrieved by any trial court ruling on standing, he has not challenged any such ruling by the trial court, and no such ruling is before us.

The only standing issue before us is whether David has standing to maintain this appeal.  David was a party to the proceedings in the trial court.  He opposed the petition for instructions on various grounds.  The petition was granted in spite of his opposition. Thus, he is aggrieved by the order and has standing to appeal it.

In *United Investors*, the court stated:  "[T]he Courts of Appeal have refused to dismiss appeals on the ground the appellate court might ultimately determine the appellant did not have standing to assert its claims in the trial court ….  'Any other approach would improperly conflate standing to appeal with the merits.  True, a vision of the world in which only litigants with meritorious appeals would have standing has some allure; in practice, however, it would mean we would regularly have to pass on the merits of an appeal in the context of a motion to dismiss, without the benefit of the record.' [Citation.]  In other words, an appellate court has *jurisdiction* to determine whether a party has standing in superior court to pursue a cause of action."  (*United Investors*, *supra*, 125 Cal.App.4th at p. 1305.)

In *United Investors*, the court determined the plaintiff had standing to appeal from the judgment of dismissal entered after the trial court sustained the defendant's demurrer without leave to amend on the ground the plaintiff did not qualify to bring the claims alleged in the complaint.  (*United Investors*, *supra*, 125 Cal.App.4th at pp.1302–1303.) The plaintiff was a party to the action in the trial court.  The plaintiff was aggrieved

7.

because its complaint was dismissed. "Even if plaintiff [had] no authority to maintain its suit in superior court, it [was] sufficiently aggrieved by the dismissal of its complaint that it [had] standing to appeal under Code of Civil Procedure section 902." (*Id*. at p. 1305.)

Plaintiffs' argument that David's interest in the trust is not or will not be affected by the trial court's order granting the petition for instructions is essentially a challenge to David's standing to oppose the petition in the trial court. The trial court opined there was sufficient evidence to dismiss David's challenge on the ground of lack of standing, but it declined to do so. Thus, the issue is not before this court and we will not rule on it.

## III.    Standard of Review

Interpretation of a statute is a question of law subject to de novo review. (*LT-WR, L.L.C. v. California Coastal Com.* (2007) 152 Cal.App.4th 770, 780.) Application of a statute to undisputed facts also presents a question of law. (*Morgan v. United Retail Inc.* (2010) 186 Cal.App.4th 1136, 1142.) Interpretation of a trust instrument presents a question of law subject to de novo review, unless interpretation turns on the credibility of extrinsic evidence or a conflict therein. (*Burch v. George* (1994) 7 Cal.4th 246, 254.) Both parties assert no extrinsic evidence was submitted to aid in interpretation of the trust documents and the material facts are undisputed. Accordingly, except where the trial court may have determined disputed factual matters (a determination subject to substantial evidence review), this appeal is governed by the de novo standard of review.

## IV.    Change of Beneficiary

### A.    *Amendment of trust by use of power of attorney*

David contends the first trust amendment was not valid because Robert's power of attorney could not be used by Kathleen to execute an amendment that changed the beneficiaries of the trust.

In the original trust instrument, Robert and Kathleen were identified as trustors; they were also "collectively called 'Trustee.'" The trust instrument contemplated that the trust would hold both community and separate property of the spouses, and that the

8.

property would maintain its original character while being held in trust. The trust instrument defined the terms "child," "children," and "issue" to mean the trustors' six children. It provided that, after the death of both trustors, the credit trust would be distributed to "such one or more of the group consisting of Trustors' issue … as the Surviving Spouse shall appoint" and the disclaimer trust would be distributed in equal shares to the children.[4]

Under current law, "[u]nless the trust instrument provides otherwise, if a trust is revocable by the settlor, the settlor may modify the trust by the procedure for revocation." (Prob. Code, § 15402.)[5] The procedures for revocation permit a trust to be revoked "[b]y compliance with any method of revocation provided in the trust instrument" (§ 15401, subd. (a)(1)), or, if the trust instrument does not explicitly make its method of revocation exclusive, "[b]y a writing, other than a will, signed by the settlor … and delivered to the trustee during the lifetime of the settlor .…" (§ 15401, subd. (a)(2).)

The Family Trust was created in 1983, before sections 15401 and 15402 were enacted. A trust created before July 1, 1987, is governed by prior law. (§ 15401, subd. (e).) Under prior law, Civil Code former section 2280 governed revocation of trusts. (*Huscher v. Wells Fargo Bank* (2004) 121 Cal.App.4th 956, 961 (*Huscher*).) Between 1931 and July 1, 1987, that section provided: "'Unless expressly made irrevocable by the instrument creating the trust, every voluntary trust shall be revocable by the trustor by writing filed with the trustee.'" (*Huscher*, *supra*, at p. 963.) "[C]ases interpreting section 2280 recognized that the right to revoke included an implied right to modify." (*Id.* at p. 962, fn. 5.) Accordingly, the procedures that applied to trust revocation applied with equal force to trust modification. (*Ibid.*)

---

[4]     If any child was not living at that time, that child's share would be distributed to his or her issue.

[5]     Further statutory references are to the Probate Code unless otherwise indicated.

When the trust instrument explicitly makes its method of revocation or modification the exclusive method, or where the trust instrument's modification procedure is so specific it would effectively preclude any other method and therefore is implicitly the exclusive method, the statutory procedure under Civil Code former section 2280 may not be used. (*Huscher*, *supra*, 121 Cal.App.4th at pp. 967–968, 970.) When the trust instrument does not make its method of revocation or modification exclusive, however, either the method set out in the trust instrument or the method described in the statute may be used. (*Id*. at pp. 970–971.)

Plaintiffs contend the trustors amended the trust while both were alive by executing the "First Amendment to Declaration of Trust" (first trust amendment). The first trust amendment recites that Robert and Kathleen, as trustees and trustors of the Family Trust, thereby amended the trust "pursuant to the authority granted in Article IV paragraph B" of the trust instrument.

Article IV, paragraph B, of the trust instrument provides:

"B.   Amendment

"The Trustors may at any time during their joint lifetimes amend any of the terms of this instrument by an instrument in writing signed by both Trustors and delivered to the Trustee .…"

Under this provision, to be effective, the amendment must be signed by both Robert and Kathleen, and delivered to them as the trustee. The first trust amendment was signed by Kathleen, on her own behalf and as attorney-in-fact for Robert. Robert did not personally sign. Thus, the first trust amendment did not comply with Article IV, paragraph B, unless Kathleen's signature as Robert's attorney-in-fact was an effective substitute for Robert's own signature.

The ability of an attorney-in-fact to execute a trust amendment on behalf of the principal is limited. The power of attorney must specifically grant the attorney-in-fact the authority to amend the trust or change the beneficiaries.

10.

"An attorney-in-fact under a power of attorney may perform any of the following acts on behalf of the principal or with the property of the principal only if the power of attorney expressly grants that authority to the attorney-in-fact:

"(a) Create, modify, revoke, or terminate a trust, in whole or in part. If a power of attorney under this division empowers the attorney-in-fact to modify or revoke a trust created by the principal, the trust may be modified or revoked by the attorney-in-fact only as provided in the trust instrument. [¶] … [¶]

"(f) Designate or change the designation of beneficiaries to receive any property, benefit, or contract right on the principal's death."  (§ 4264.)

Although section 4264 was enacted in 1994 and became operative on January 1, 1995, it "applies to all powers of attorney regardless of whether they were executed before, on, or after January 1, 1995."  (§ 4054, subd. (a).)

The durable power of attorney granted Kathleen the authority "to create, amend, supplement or terminate any trust" of which Robert was a trustor or beneficiary.  The first trust amendment, executed by Kathleen as attorney-in-fact for Robert, redefined the terms "child," "children," and "issue" to exclude Paul and to include Contin.  It expressed the trustors' specific intent not to provide for Paul or his issue in the trust instrument. The amendment had the effect of changing the persons to whom the surviving spouse could distribute the credit trust and changing the persons among whom the disclaimer trust would be distributed after the death of both trustors.  Thus, the effect was to make a change to the beneficiaries, excluding one of the original beneficiaries and adding a new beneficiary.

Robert's power of attorney to Kathleen did not expressly authorize her to designate or change the designation of beneficiaries of the Family Trust.  We cannot construe the authorization to amend the trust as authorization to change the beneficiaries, because to do so would render section 4264, subdivision (f), superfluous.  In determining the meaning of a statute, "[t]he language must be construed 'in the context of the statute as a whole and the overall statutory scheme, and we give "significance to every word,

11.

phrase, sentence, and part of an act in pursuance of the legislative purpose.""" (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 83.) We construe section 4264 to require that the power of attorney contain specific authorization to designate or change beneficiaries in order to grant that power to the attorney-in-fact. We conclude authorization to designate or change beneficiaries is not conveyed by language permitting the attorney-in-fact to "[c]reate, modify, revoke, or terminate a trust." (§ 4264, subd. (a).) Accordingly, the power of attorney granting Kathleen the authority "to create, amend, supplement or terminate" a trust in which Robert was a trustor did not grant her the power to designate or change the beneficiaries of such a trust as his attorney-in-fact.

The first trust amendment also amended the trust instrument to authorize the executor of the estate of the deceased spouse to elect to treat all or a portion of the property in the survivor's trust as QTIP for purposes of federal estate tax law. Such an amendment would not change the beneficiaries of the trust, but would fall within the provision of the power of attorney permitting the attorney-in-fact "to create, amend, supplement or terminate any trust" of which Robert was a trustor. Under section 4264, subdivision (a), however, when the power of attorney contains a provision authorizing the attorney-in-fact to modify or revoke the principal's trust, "the trust may be modified or revoked by the attorney-in-fact only as provided in the trust instrument." The Family Trust instrument did not permit a trustor's attorney-in-fact under a power of attorney to amend or revoke the trust. Article IV, paragraph D, of the trust instrument required the trustors to personally exercise the power to amend or revoke the trust:

"D. <u>Power as Personal</u>

"The powers of the Trustors to alter, amend or revoke this instrument are personal to them and shall not be exercised by any guardian, conservator or other person, except if authorized, after notice to the Trustee and all beneficiaries, by the Court that appointed the guardian or conservator."

Because the first trust amendment was not executed by both trustors, it did not validly amend the trust under Article IV, paragraph B, of the trust instrument.

### B.      *Effect of Schubert v. Reynolds*

Citing *Schubert v. Reynolds* (2002) 95 Cal.App.4th 100 (*Schubert*), plaintiffs argue Kathleen had authority to use the power of attorney to change the beneficiary designation as long as the change was consistent with Robert's estate plan. In *Schubert*, one of decedent's four children, Reynolds, had been given his power of attorney. She used it the day before his death to create a trust in which decedent's residence would be held for Reynolds for life, with the remainder to decedent's grandchildren. (*Id.* at p. 102.) Schubert, another of decedent's children, sued to invalidate the trust, contending section 4264, subdivision (f), prevented Reynolds from designating or changing beneficiaries, and the trust altered the disposition of the property from the disposition in decedent's will, which divided decedent's property equally among his children, and from the provisions for intestate succession. (*Schubert,* at pp. 102–103.) The power of attorney used by Reynolds authorized her to create a trust, but did not expressly authorize her to change a beneficiary designation. (*Id.* at pp. 103–104.)

The court found an apparent conflict between subdivisions (a) and (f) of section 4264. (*Schubert, supra,* 95 Cal.App.4th at p. 105.) Subdivision (a) permitted an attorney-in-fact to create a trust when expressly authorized by the power of attorney, and creation of a trust requires designation of beneficiaries. Subdivision (f), however, prevented an attorney-in-fact from designating or changing beneficiaries unless expressly authorized by the power of attorney. "It would appear that the authority conferred under Probate Code section 4264, subdivision (a), to create a trust and, by implication, to designate beneficiaries, is taken away under subdivision (f), unless the power to designate beneficiaries is also expressly granted under the power of attorney." (*Schubert*, at p. 105.)

13.

The *Schubert* court harmonized these provisions by concluding an attorney-in-fact may create a trust when authorized to do so by the power of attorney, but he or she may only designate as beneficiaries the principal, or "[a]rguably … other beneficiaries … consistent with the principal's existing estate plan or the laws of intestate succession, provided that doing so did not effectuate a *change* in 'the designation of beneficiaries to receive any property ... on the principal's death.'" (*Schubert, supra,* 95 Cal.App.4th at p. 105.) Under those circumstances, the beneficiaries would, in effect, be designated by the principal, pursuant to his original estate plan, or by the Legislature, through the laws of intestate succession. (*Id*. at pp. 105–106.) Because the trust Reynolds created attempted to change the beneficiaries from those set out in decedent's will or in the laws of intestate succession, it violated section 4264, subdivision (f), and was invalid. (*Schubert,* at pp. 106–107.)

*Schubert* is distinguishable. There, the attorney-in-fact created a trust and attempted to name beneficiaries, and the court was required to construe apparently conflicting subdivisions of section 4264 because the creation of a trust requires a designation of beneficiaries. Here, the trust was already in existence at the time Kathleen signed the first trust amendment. There was no need to designate new or different beneficiaries, and neither the trust instrument nor the power of attorney expressly authorized her to do so. In that situation, any apparent conflict between subdivisions (a) and (f) of section 4264 is easily resolved. Subdivision (a) permits the attorney-in-fact to modify the provisions of an existing trust when the trust instrument authorizes that action, but subdivision (f) creates an exception, preventing the attorney-in-fact from changing the provisions designating the beneficiaries who will receive the benefits of the trust on the principal's death, if that action is not also expressly authorized. The *Schubert* court's method of harmonizing the provisions of section 4264 is not necessary or appropriate in this case; its decision does not affect the outcome here.

## C.  *Effect of Article IV, paragraph A of the trust instrument*

Article IV, paragraph A, of the declaration of trust provides:

> "A.  Revocation During Joint Lifetimes
>
> "The Trustors, while both are living, may alter, amend or revoke this trust in whole or in part as to the community property by written notice to the Trustee from either Trustor, and as to the separate property by written notice to the Trustee from the Trustor who contributed the separate property.
>
> "On revocation the Trustee shall deliver all or the designated portion of the community property to the Trustors, which shall continue to be the community property of the Trustors, and all or the designated portion of any separate property to the contributing Trustor."

Although the heading refers to "revocation," the first provision of paragraph A authorizes the trustors to "alter, amend or revoke" the trust by the specified method. The method allows amendment by "written notice to the Trustee from either Trustor," but limits its effect to the community property and the separate property of the trustor giving the notice. The trial court found that Robert and Kathleen both intended to amend the trust to remove Paul as a beneficiary. It also found Houk mailed a copy of the second codicil and first trust amendment to Robert and Kathleen for their records about a week after the documents were signed. These findings were supported by substantial evidence. The first trust amendment took the form of a writing, signed by one trustor, Kathleen, and mailed by attorney Houk to both Robert and Kathleen, collectively the trustee. Thus, under Article IV, paragraph A, the first trust amendment was effective to amend the trust as to the community property and Kathleen's separate property.

## D.  *Effect of second codicil to Robert's will*

The only remaining question is whether the amendment was effective as to Robert's separate property based on any other theory presented. Plaintiffs contend that, by executing the second codicil to his will (which he executed on the same day Kathleen executed the first trust amendment), Robert effectively complied with the provisions of

15.

Article IV, paragraph A, thereby amending the trust as to the community property and his separate property.

In the second codicil, Robert declared that document to be the second codicil to his will dated May 13, 1983. He changed the portion of his will that originally defined the terms "child," "children," and "issue" as the trustors' six children; as amended, the terms excluded Paul and included the five other children and Contin. The second codicil stated Robert "specifically [did] not provide in this Will for Paul Lee Harrell or his issue," and "[f]or purposes of this Will Paul Lee Harrell shall be deemed to have predeceased me and left no issue surviving him." Robert also authorized his executor to exercise elections given to the executor of the deceased spouse's estate by the Family Trust instrument, including elections pertaining to the survivor's trust. The second codicil provided: "In exercising any of such discretions, the judgment of my executor shall be final." In all other respects, Robert confirmed and republished his will and the first codicil.

Plaintiffs argue the second codicil effectively amended the trust instrument because it constituted written notice to the trustee of Robert's intent that Paul be eliminated as a beneficiary and Contin be added as a beneficiary, and notice was given to both Robert and Kathleen as trustee during their lifetimes. The second codicil, however, amends Robert's will, not the Family Trust. It is identified by Robert as "the Second Codicil to my Will." It amends "Paragraph SECOND of my Will dated May 13, 1983," adds "subparagraph (d) to Paragraph TWELFTH of my Will," and confirms and republishes the remainder of his will. It mentions the trust only when it amends *the will* to authorize the executor of Robert's estate, in his discretion, to exercise any "rights, decisions, or elections" given to the executor by the trust instrument. Nothing in the second codicil expresses any intent to thereby amend the declaration of trust or change the beneficiaries of the trust. Delivering a copy of the second codicil to the trustees would not give them notice that the trust instrument was being modified. Consequently,

16.

the second codicil cannot be interpreted as an amendment or modification by Robert of the trust instrument.

Plaintiffs rely on *Gardenhire v. Superior Court* (2005) 127 Cal.App.4th 882 (*Gardenhire*) in arguing that the second codicil effectively amended the trust instrument. In *Gardenhire*, decedent created a trust in 1989, naming herself as trustee. On her death, the trust assets were to be held in trust for certain beneficiaries, with remainder to a hospital. She also executed a pour-over will, in which she left her estate to the trust. (*Id*. at pp. 885–886.) In 2002, decedent executed a new will in which she revoked all prior wills and expressed "her intent 'to dispose of all real and personal property which I have the right to dispose of by Will.'" (*Id*. at p. 886.) The 2002 will put the residue of her estate in a testamentary trust for certain beneficiaries, with the remainder to go to a maternity home. The 2002 will did not expressly revoke the 1989 trust. On decedent's death, one of the beneficiaries under the 2002 will petitioned for a determination that the trust had been revoked by the new will and the will governed disposition of the former trust property. (*Ibid*.)

The trust contained a provision permitting the trustor to amend or revoke the trust "'by written notice signed by the Trustor and delivered to the Trustee.'" (*Gardenhire*, *supra*, 127 Cal.App.4th at p. 886.) The court concluded that, "because [decedent] did not limit or qualify the term 'written notice,' she authorized revocation via *any* writing that unambiguously manifested her intent to revoke, including a will." (*Id*. at p. 888.) It distinguished two cases in which amendment by will had been rejected, where the trust permitted amendment during the trustor's lifetime by a writing executed by the trustor and delivered to the trustee, but the trustor had not delivered the will that revoked the trust to the third party trustee within the trustor's lifetime.

The *Gardenhire* court also rejected the argument that revocation by will was allowed only when the trust specifically and expressly authorized it. (*Gardenhire*, *supra*, 127 Cal.App.4th at pp. 893–895.) Section 15401 did not impose such a limitation. It

17.

authorized the trustor of a revocable trust to amend or revoke it "[b]y compliance with any method of revocation provided in the trust instrument" (§ 15401, subd. (a)(1)) or, if the trust instrument did not explicitly make its method of revocation exclusive, "[b]y a writing, other than a will, signed by the settlor … and delivered to the trustee during the lifetime of the settlor …." (§ 15401, subd. (a)(2)). The court stated:

> "On its face, the statute does not require that a trust contain a specific and express provision authorizing revocation by will. Nor does subdivision (a)(2) represent a proviso to subdivision (a)(1) to the effect that although a trust may provide *any* method of revocation, if the trustor wants to allow revocation by will, then he or she may not use general language, such as *written notice,* that would necessarily [encompass] a will; rather the trustor must instead expressly specify that a will can constitute written notice. Moreover, we do not find the statute ambiguous concerning whether subdivision (a)(1) implicitly requires an express provision if a trustor wants to authorize revocation by will." (*Gardenhire*, *supra*, 127 Cal.App.4th at p. 894, fn. omitted.)

While plaintiffs are correct that *Gardenhire, supra,* concluded a trust that authorizes revocation "'by written notice signed by the Trustor and delivered to the Trustee'" (127 Cal.App.4th at p. 886) may be revoked by any writing that unambiguously manifests the trustor's intent to revoke the trust, including a will, they have not established any such manifestation of intent that would cause the *Gardenhire* rule to apply in this case. In *Gardenhire*, the trustor revoked an earlier trust by providing in her will for a completely different and inconsistent disposition of her property and expressing her intent in the will to thereby dispose of all her real and personal property. Robert's second codicil does not unambiguously manifest his intent to revoke the Family Trust. It does not express his intent to revoke the trust and dispose of all his property through his will or the codicil, rather than through the trust. It does not provide an entirely inconsistent disposition of his property from which an intent to revoke the trust can be inferred. Nor do we understand plaintiffs to contend that Robert's second codicil revoked the Family Trust, so his property should be disposed of under his will and the codicils.

18.

Rather, plaintiffs seem to contend Robert's second codicil merely amended the trust instrument. But the second codicil does not unambiguously manifest Robert's intent to modify the Family Trust. It was prepared in the format of a codicil to a will, identified itself as a second codicil to Robert's will, and changed specific paragraphs of Robert's will. It did not mention any changes to the Family Trust instrument. Consequently, we conclude the second codicil to Robert's will cannot be construed to amend the Family Trust.

### E. Amendment or ratification by signing a new Schedule A

The original trust instrument included a Schedule A, which listed the property of the trust. On April 8, 1998, approximately a month after execution of the first trust amendment and Robert's second codicil, Robert and Kathleen executed a new Schedule A to the Family Trust instrument. The introductory language in that document stated that Robert and Kathleen, "the Trustors of the [Family Trust] established under Declaration of Trust dated May 13, 1983, *as amended by First Amendment thereto dated March 11, 1998,* hereby set forth the following assets as the property of the trust." (Italics added.) Plaintiffs contend that, by signing this document, either Robert ratified Kathleen's act of signing the first trust amendment on his behalf, or Robert and Kathleen jointly created or amended a trust governed by the original trust instrument and the March 11, 1998, first trust amendment. We agree.

"'Ratification is the voluntary election by a person to adopt in some manner as his own an act which was purportedly done on his behalf by another person, the effect of which, as to some or all persons, is to treat the act as if originally authorized by him.'" (*Estate of Stephens* (2002) 28 Cal.4th 665, 673.) "It is well settled … that whenever an agent acting under a specific authorization has exceeded his authority in the performance of a lawful act, which the principal could have authorized, the principal may thereafter ratify such unauthorized act, and when so ratified it acts retrospectively and the principal is equally bound as he would have been had the original authority been ample, or had he

19.

originally performed the act in person." (*Moody v. Judah Boas Finance Corp.* (1928) 93 Cal.App. 21, 25.)

Under Article IV, paragraph B, of the trust instrument, Robert had the authority, jointly with Kathleen, to sign an amendment to the trust instrument that changed the terms or the beneficiaries of the trust. The power of attorney Robert gave to Kathleen did not authorize her to execute on his behalf an amendment changing the beneficiaries of the trust or amending the trust when the trust instrument did not authorize the attorney-in-fact of a trustor to do so. To the extent Kathleen exceeded the authority conferred on her by Robert's power of attorney when she signed the first trust amendment on his behalf, Robert had the ability to ratify Kathleen's action.

Ratification of an agent's act "can be made only in the manner that would have been necessary to confer an original authority for the act ratified." (Civ. Code, § 2310.) "Because a power of attorney must be in writing, any act performed by the agent acting under the power of attorney must therefore be ratified in writing to be valid." (*Estate of Huston* (1997) 51 Cal.App.4th 1721, 1727.) "Ratification of the previously unauthorized acts of an agent requires that the principal have full knowledge of all of the facts, particularly of the acts of the person claiming to act as agent. The principal must also have full knowledge of his rights in the matter, which implies a knowledge of the legal effect of the acts, and to constitute a ratification the principal must be acquainted with what has actually been done, and he is not bound by an approval made under a misapprehension of the real nature of the facts." (*In re Estate of Fletcher* (1940) 36 Cal.App.2d 567, 573.) "However, where ignorance of the facts arises from the principal's own failure to investigate and the circumstances are such as to put a reasonable man upon inquiry, he may be held to have ratified despite lack of full knowledge." (*Volandri v. Hlobil* (1959) 170 Cal.App.2d 656, 659 (*Volandri*).)

The trial court found that both Robert and Kathleen intended to amend the trust to remove Paul as a beneficiary. Substantial evidence supports that finding. Their attorney

prepared the first trust amendment, the second codicil, and the updated Schedule A. It is undisputed that Robert and Kathleen were both present with their attorney when Robert signed the second codicil to his will and Kathleen signed the first trust amendment. Attorney Houk and his employee, Hoskins, witnessed Robert's signature on his second codicil, and Hoskins notarized Kathleen's signatures on the first trust amendment. The language of the two documents is similar. Both remove Paul as an heir or beneficiary and add Contin, by redefining the terms "child," "children," and "issue" to exclude Paul and include Contin, and by stating Paul shall be deemed to have predeceased the trustors without leaving surviving issue. The first trust amendment authorizes the executor of the estate of the deceased spouse to elect to treat all or a portion of the survivor's trust as QTIP in order to qualify for the marital deduction allowable under federal estate tax law. The second codicil authorizes Robert's executor to exercise any elections given to the executor of the estate of the deceased spouse by the Family Trust.

It is undisputed that, less than one month after the signing of the first trust amendment and Robert's second codicil, Robert and Kathleen, as trustors of the Family Trust, executed a new Schedule A to that trust. The apparent purpose was to update the list of assets constituting the trust estate by replacing the original Schedule A attached to the declaration of trust with the new Schedule A. The introductory language of the new Schedule A identified Robert and Kathleen as the trustors of the Family Trust, "as amended by First Amendment thereto dated March 11, 1998." By signing the updated Schedule A containing this language, and identifying the property that formed the corpus of the trust as so amended, Robert manifested his intent to ratify the first trust amendment executed by Kathleen, so that it modified the original trust provisions governing the trust estate.

The undisputed facts indicate Robert was aware of the existence and effect of the first trust amendment. The first trust amendment was prepared by Robert's attorney, Houk, and contained language similar to that of the second codicil, which Robert signed.

21.

Robert and Houk were present when the first trust amendment was signed and notarized. Houk subsequently mailed a copy to Robert and Kathleen. There is no evidence Robert objected to or tried to undo the first trust amendment at any time after it was signed or after it was mailed to him. Robert signed the updated Schedule A less than a month after it was executed. It specifically referred to the first trust amendment as an amendment to the Family Trust. If, as David contends, Robert declined to sign the first trust amendment because he did not desire to execute it, the reference to it in the first sentence of the updated Schedule A gave him the opportunity to object to it, but he did not do so. Further, if he did not understand or approve of the amendment, the reference to it in Schedule A was sufficient to put him on inquiry about the existence and effect of the amendment. By signing Schedule A, he indicated his approval and ratification of the amendment, either because he was already well aware of the amendment and its effect, and intended it to be part of the trust instrument, or because, where "the circumstances are such as to put a reasonable man upon inquiry [and he fails to investigate,] he may be held to have ratified despite lack of full knowledge." (*Volandri*, *supra*, 170 Cal.App.2d at p. 659.)

Based on the undisputed facts and the facts found by trial court, which were supported by substantial evidence, we conclude Robert's signature on Schedule A constituted ratification of the execution of the first trust amendment. Because of Robert's ratification of the first trust amendment, we conclude the amendment governs all of the property of the Family Trust—Robert's separate property, as well as the community property and Kathleen's separate property.

V.     **Survivor's Trust:  Revocability and Power of Appointment**

David asserts the first trust amendment, if valid, gives the executor of Robert's estate an option to elect that all or part of the assets of the survivor's trust "be treated as qualified terminable interest property for the purposes of qualifying for the marital deduction allowable in determining the federal estate tax upon the estate of the deceased

22.

spouse." He contends that, because of the executor's right to make an election, the survivor's trust cannot be amended or revoked by Kathleen. He cites no legal authority for this assertion.

Federal tax law imposes a tax on decedents' estates. (26 U.S.C. § 2001.) For married couples, it creates a marital deduction that may be used in computing the value of the taxable estate on the death of the first spouse. (26 U.S.C. § 2056.) "The policy behind the marital deduction rule is that property passes untaxed from the first spouse to die to his or her surviving spouse but then is included in the estate of the surviving spouse." (*Estate of Turner v. Commissioner* (2012) 138 T.C. 306, 317.) "The marital deduction is generally restricted to the transfer of property interests that will be includable in the surviving spouse's gross estate. This is because the purpose of the deduction 'is only to permit a married couple's property to be taxed in two stages and not to allow a tax-exempt transfer of wealth into succeeding generations.'" (*Farley v. United States* (Ct.Cl. 1978) 581 F.2d 821, 835.)

A life estate with power of appointment in the surviving spouse may qualify for the marital deduction. (26 U.S.C. § 2056, subd. (b)(5).) QTIP property may also qualify for the marital deduction. (26 U.S.C. § 2056, subd. (b)(7).) Property may qualify as QTIP if it passes from the decedent, the surviving spouse has an income interest in it for life, no one has a power to appoint the property to anyone other than the surviving spouse, except at or after the death of the surviving spouse, and an election to treat the property as QTIP has been made. (26 U.S.C. § 2056, subd. (b)(7)(B).) The election must be made by the executor of the deceased spouse's estate on the estate tax return, and it is irrevocable. (26 U.S.C. § 2056, subd. (b)(7)(B)(v).)

Because of the difficulty in determining prior to the death of the first spouse how much property should be designated as QTIP in order to minimize estate taxes on the death of the first spouse, the QTIP election need not be made until after the death of the first spouse. (*Estate of Spencer v. Commissioner* (6th Cir. 1995) 43 F.3d 226, 227.) As

the *Spencer* court observed: "Wills are often drafted a decade or more before death. Property is sold and acquired and goes up or down in value during this period. Family situations change. It is often impossible to prudently designate what should be committed as QTIP far in advance of death. By statute the election can only be made after the death of a decedent." (*Id*. at p. 228.) Accordingly, whether property qualifies as QTIP is determined on the date the election is made. (*Ibid.*) "Once an election has been made and a marital deduction allowed with respect to QTIP property, a surviving spouse's transfer of any interest in that property triggers gift tax on the remainder interest." (Ross & Cohen, Cal. Practice Guide: Probate (The Rutter Group 2014) ¶ 10:155.13.)

The option to make an election to treat property as QTIP does not bind the property before the election is made. Thus, the option given to the executor of Robert's estate to designate some or all of the property of the survivor's trust as QTIP would permit the executor, on the date of the election, to designate all or a portion of whatever property was then held in the trust, if it qualified for the designation and would minimize the tax liability of Robert's estate.

The original trust instrument provided that, on the death of the first spouse, the trustee was to divide the trust into three trusts, one of which was the survivor's trust. The survivor's trust was to include, among other things, "[t]he minimum pecuniary amount necessary to entirely eliminate (or reduce as much as possible) any Federal Estate Tax and Generation-Skipping Tax at the death of the Deceased Spouse," taking into account the marital deduction and other matters. The surviving spouse was given "the power to alter, amend or revoke the Survivor's Trust … in whole or in part."

The first trust amendment added a provision to the trust instrument, expressing the trustors' intention "that the Survivor's Trust qualify for the marital deduction." "Accordingly, the executor of the estate of the deceased spouse in such executor's discretion, is authorized to elect that any part or all of any of the amount allocated to the

24.

Survivor's Trust be treated as qualified terminable interest property for the purposes of qualifying for the marital deduction." In exercising that discretion, "the judgment of such executor shall be final, notwithstanding its possible effect on the conflicting interests of the various beneficiaries and heirs."

Nothing in the first trust amendment changed the provision in the original trust instrument granting the surviving spouse the power to revoke or amend the survivor's trust. Through the amendment, the executor's power to make the QTIP election was added to the trust instrument. If the survivor's trust is revoked by the surviving spouse, that power is revoked along with all the other provisions of the trust instrument. The statutory provision making the QTIP election irrevocable (26 U.S.C. § 2056, subd. (b)(7)(B)(v)) applies only after the election has been made. If, after the election is made, the surviving spouse disposes of the property in a way that is inconsistent with the election, then the property may be subject to estate or gift taxation.

Contrary to David's characterization, the provision in the first trust amendment permitting the executor of Robert's estate to make a QTIP election as to some or all of the property in the survivor's trust does not "trump" the provision of the original trust instrument granting Kathleen the power to alter, amend, or revoke the survivor's trust. Accordingly, the trial court did not err in concluding the survivor's trust is revocable and subject to amendment by Kathleen.

## VI.  Special Power of Appointment over Credit Trust

The trial court determined the credit trust is now irrevocable, but Kathleen has a special power of appointment permitting her to direct the distribution of the assets of that trust among those identified as the trustors' issue. David contends this determination is inconsistent, because if the trust is irrevocable, it "cannot be amended by the exercise of a power of appointment." The exercise of a power of appointment is not an amendment of the trust.

"A power of appointment is a power given by the donor of property to the donee, which enables the donee to designate the appointees or persons who are to take the property at some future time. [Citation.] A general power of appointment is one which may be exercised in favor of anyone, including the donee, and is equivalent to a grant of absolute ownership. A special power is one which may be exercised in favor of certain specified individuals or to a class of designated persons, not including the donee or his estate." (*Estate of Dailey* (1982) 130 Cal.App.3d 993, 998 (*Dailey*).) Here, the trust instrument provided for the creation of three trusts upon the death of the first spouse: a survivor's trust, a credit trust, and a disclaimer trust. It granted the surviving spouse a general power of appointment over the assets of the survivor's trust; on the death of the surviving spouse, the remaining balance in the survivor's trust, after payment of specified items, is to be distributed to those persons or entities, including the surviving spouse's estate, appointed by the surviving spouse. If the surviving spouse fails to exercise the power of appointment, the trustee is to add the remaining portion of the survivor's trust to the credit trust and "distribute the balance then remaining of the Credit Trust to such one or more of the group consisting of Trustors' issue … as the Surviving Spouse shall appoint by written instrument." Thus, the original trust instrument granted Kathleen, as the surviving spouse, a special power of appointment to determine to which of the trustors' "issue" the balance in the credit trust will be distributed upon her death.

The power of appointment is not an amendment of the trust. The trust instrument created the power of appointment. The power of appointment must be exercised, if at all, in accordance with the provisions of the trust instrument. (*Dailey*, *supra*, 130 Cal.App.3d at p. 998 ["The donee of a special power is subject to the limitations imposed by the creating instrument"].) Exercise of the power of appointment is not an amendment of the trust, but a carrying out of its terms.

When a trust instrument creates a power of appointment, the power is revocable to the same extent as the trust in connection with which it was created. (Prob. Code,

26.

§§ 695, 15400; Cal. Law Revision Com. com., West's Ann. Prob. Code (2002 ed.) foll. § 695, p. 377.) Thus, when the credit trust became irrevocable, the power of appointment likewise became irrevocable.

There is no inconsistency in the trial court's determination that, after the death of Robert, the credit trust became irrevocable, but Kathleen still held a special power of appointment by which she can direct the distribution of the assets of the trust among those identified in the first trust amendment as the trustors' issue.

## *DISPOSITION*

The August 21, 2014, order granting petition for instructions is affirmed. Plaintiffs are entitled to their costs on appeal.

_____

HILL, P. J.

WE CONCUR:

_____

KANE, J.

_____

SMITH, J.

27.